Number 171912, Robert Keech v. Wheeling & Lake Erie Railroad Co. May I reserve two minutes for rebuttal? Yes. May it please the Court, Robert Keech, for the Estate Representative of the Post-Effective Data State of Montreal, Maine and Atlantic Railway Ltd., MMA, as the successor to the Chapter 11 trustee of MMA, the original plaintiff in this case. The only issue before the Court, as to which this Court, of course, exercises de novo review in all aspects, is whether the trustee properly alleged a plausible claim for an insider preference against Wheeling, and specifically, whether the trustee alleged that the greater than $2.7 million payment to Wheeling was an asset within the meaning of the Uniform Federal Transfer Act, in this case, 14 MRSA 3572-2, meaning that the transfer consisted of property not fully encumbered at the time of the transfer by a valid Wheeling. The complaint here does so allege, and clearly, at multiple locations in the complaint. The sub-issue is whether the so-called Second Amendment to the FRA Loan Agreement contradicted those allegations. It did not. Indeed, that document, an incomplete copy of which was attached by the defendant, Wheeling, to a cert reply to the plaintiff's reply to the motion to dismiss, actually supports the allegations, or is, at best, ambiguous, and therefore, within this circuit's precedent, can't contradict the allegations of the complaint. In conducting its review, of course, the panel accepts the allegations of the trustee's complaint as true, and all reasonable inferences are drawn in favor of the trustee as the non-move-on. We would submit that the Bankruptcy Court did not apply that standard in this case. In addition to the complaint, of course, under circuit precedent, the court, considering a motion to dismiss, normally, of course, cannot consider documents outside the pleadings. We recognize that there is a narrow exception outlined in Beddahl v. State Street Bank & Trust Company, where a complaint's factual allegations are expressly linked to, and admittedly dependent upon, a document, the authenticity of which is not challenged. That document merges into the pleadings, and the trial court can review it in deciding a motion to dismiss under Rule 12b-6. And under this court's Yacoubian decision, when that attached or defendant-submitted document unquestionably and unambiguously contradicts the allegations of the complaint, that document can trump the allegations. However, under Yacoubian and this court's decision in Alternative Energy v. St. Paul Fire & Marine Insurance Company, the document must unambiguously contradict the allegations. A document that merely raises factual issues does not support a 12b-6 dismissal. In this case, the document questioned in the Second Amendment was not a document that we depended upon for the cause of action. In other words, the cause of action did not depend on its existence or pleadings from it, so it doesn't actually trigger the Beddahl Doctrine. Well, I think that is, that may possibly be classified as wishful thinking on your part. I mean, you are challenging the fact that a certain property you allege to be unencumbered. Whether or not that property is unencumbered depends on the effect and implementation of a particular agreement, which is exemplified most particularly by the Second Amendment. So I think that the District Court was perfectly within its rights to look to the Second Amendment and to attempt to read the rather conclusory allegations of the complaint against the backdrop of the Second Amendment. And I don't think there was any challenge made in the Bankruptcy Court to the Court's capacity or ability to look to the Second Amendment. Your Honor, we didn't actually think we were going to look to the Second Amendment until we had the decision, but more to the point. Well, but you knew it was before the Court. You knew it was attached to the SORA plot. And I want to bog down here. It certainly depends on the implementation of the agreement. It depends on the recording of the UCC-3 termination statement, which was called for in the agreement, and the UCC-3 termination statement, which was actually attached to the agreement, which attachments the defendants did not actually give to the Court. They gave them a document without any exhibits attached. The exhibit, the UCC-3, specifically provides that the FRA is releasing its landing proceeds. But even if that all applies, and we'll assume that it does, that all provides no assistance to the 1206 motion here. The document here actually supports the allegations. It does not directly contradict them in any way, shape, or form. The agreement, the Second Amendment, actually establishes that the FRA is releasing its land and proceeds. But the problem is that you, and this is a legal question that goes to the interpretation of the Second Amendment, you want us to read, and you wanted the Bankruptcy Court and the District Court, to read the Second Amendment, to balkanize it, to parse it step by step, as if the Second Amendment recited a series of separate transactions. The Second Amendment, fairly read, so the Bankruptcy Court found and the District Court found, sets up a single transaction that had several parts, all of which were to be implemented as a whole. On that interpretation, there was no separation of the property from the encumbrance because the encumbrance was lifted only to permit, at the same time, the monies to be paid as specified in the Second Amendment. Now you want to treat this as if it were a step transaction. Everything taken step by step and occurring at discrete and finite times. If that's not a realistic or plausible, to use the language of Twombly and Iqbal, plausible interpretation of the Second Amendment, then this order is sustainable. If it's an implausible interpretation of the Second Amendment, then the order should be reversed. Your Honor, it's not a plausible reading of the Second Amendment to say that there was no separation. In fact, the Second Amendment specifically contemplated separation, even when we're talking about a case. Where in the Second Amendment does it contemplate any sort of temporal separation? It describes a series of transactions which are either several steps in accomplishing a single transaction or several separate transactions. I think that's a matter of law for the court, but I'm not aware of seeing any temporal separation here. Well, let me explain why I think it's there. First and foremost, Your Honor, there's nothing in the Second Amendment that suggests that the FRA is allowing these proceeds to be distributed by the debtor, subject to its lien. And in order for the 1286 motion to be sustained, you have to find that when the proceeds were transferred, they were subject to the FRA's lien. They were not. No, but I don't think that's the issue. I think the issue is, should this document be read that the FRA released its lien and then the debtor did what the debtor did with the property, because at that point the property was unencumbered. You win at the pleading stage. Does this agreement specify that the FRA agreed to release its lien so long as the money was applied in particular ways, in which case it's all part of a single transaction? The former of those two is true. The latter of those two is not. And let me explain why. The thing that separates this transaction from the typical transaction where the bank releases its lien and gets the money subject to its proceeds and pays itself off is the critical fact under this agreement is the issue of replacement collateral. And what happened in this case was the FRA agreed to release its lien to allow the property to be sold. That's step one. It then insisted that it receive replacement collateral for the collateral that had just been sold. It received replacement collateral. Upon the perfection of its interest in replacement collateral, it also filed the UCC-3 releasing its interest in the proceeds of the sale, among other things. The money was then put into the FRA. Is there anything in the record that says that the replacement collateral was equal to the value of the remaining debt? The document itself contemplates that the replacement collateral was substituting for the entire asset sold. And what the FRA releases lien, in fact, before the replacement collateral was perfected, the reason the money was put in extra was to allow for perfection of the replacement collateral. The document then says the money goes from the escrow agent to the debtor. It doesn't even stay with the escrow agent. And the debtor then distributes it in accordance with the waterfall. The first payment is to the FRA in a reduced amount and then free and clear to everyone else. If the FRA had gotten $5 million and distributed the amount to Wheeler directly, would you be making the same argument? Certainly. I mean, that would be the bigger preference for Wheeler. It would actually be a preference and a fraudulent conveyance. But this case is somewhat on point with the sort of national loan case that we cited, where in that case the lender agreed that it would take $5 million against a much larger obligation, leaving $14 million in extra proceeds. And what the court found in that case is that the agreement to take less money was an agreement to reduce the lien to the amount that they had agreed to take, meaning that upon the consummation of the sale, all of the remaining proceeds were unencumbered. This is exactly that case. Well, that's contradictory. Otherwise, because if it was a settlement in full, then there would be no need to get extra collateral. Well, the FRA would owe close to $30 million in this transaction. So it would take $5 million. It would have taken $30 million. It would have taken the entirety of the sale proceeds. It would not have paid them off in full. But what they agreed to do in advance, this was a bailout transaction for the railroad, Your Honor. What they agreed to do in advance was reduce the amount they would take, $2.7 million, when they were owed 10 times that. They reduced their lien to $2.7 million. They took that amount, and then they agreed to take replacement collateral. But it's clear that the way the transaction was written in the Second Amendment and the way it was contemplated is that they would release their lien to allow the sale. They released their lien and the proceeds. They took replacement collateral. Then they allowed the debtor to have the proceeds that were then subject to a waterfall agreement. What the bankruptcy court said was, well, we have this waterfall agreement, and the FRA controls the distribution of the proceeds. Therefore, it must have had a lien, or it must have retained a lien in proceeds. The bankruptcy court itself admitted that the Second Amendment contains no provision that says the FRA is retaining a lien. It had to reason its way there, not as a construction of the contract, but by making an assumption about what must have been by virtue of the control provisions. The control provisions, however, don't suggest anything about a lien. The control provisions, so-called, don't give the FRA control. What happened was the debtor and the FRA agreed on a waterfall. That's a standard commercial transaction provision. But the fact that there's a waterfall, even the fact that a third party, such as a security creditor or a purchaser, is directing where the proceeds go, that's not a lien. And the only issue here is not who controlled the proceeds, not whether the proceeds were subject to any direction by a third party. The only issue is whether there was a valid lien that couldn't be defeated by a lien creditor under the UFTA. At the time they transferred the proceeds, there was no such valid lien here. Thank you. Thank you, Your Honor. Good morning. May it please the Court. My name is George Marcus. I am from Portland, Maine. I represent the Wheeling and Lake Erie Railway Company. I'd like to call the Court's attention to a number of matters that I think fairly undercut the argument just made by the appellant. First, one of the things relied upon by the bankruptcy court in ruling that the transactions in question, the transactions contemplated by the Second Amendment, were a single integrated, one single transaction, not a series of separate steps, was the complaint filed by the appellant, a companion complaint to the Wheeling complaint, in what was referred to as the Case de Depot litigation. The Wheeling complaint and the Case de Depot complaint were filed substantially at the same time as companions. Now, the bankruptcy court took judicial notice of the Case complaint, and in paragraphs 84 and 85, here's what the appellant says. All of the participants involved in the Second Amendment to the FRA loan, the document we've just been discussing, the P&S and the 2011 termination, collectively the 2011 transactions, intended and planned that all transactions involved would occur simultaneously in interdependent related transactions. Paragraph 185. The 2011 transactions should be collapsed into a single, integrated transaction for purposes of determining whether those transactions were fraudulent. Why should those two complementary provisions be honored? It, in effect, is saying we're making an agreement that will affect the rights, for example, of a bankruptcy trustee, and the agreement is basically that there is magic going on here. Magic being that everything happens at precisely the same time for legal purposes, when in reality, when in fact, they don't occur. Why should that kind of, I'm going to call it a magic agreement, be accepted for purposes of determining the existence of the lien and consequently the ultimate issue of preference? Your Honor, I believe the reason that it should be rests in the notion of plausibility. What is the most plausible? What is the plausible interpretation of the Second Amendment? What the trustee wants to advance, what the appellant, the estate, wants to advance, is that the plausible interpretation of the Second Amendment was that, first, FRA releases its lien in the railroad facilities itself. They're sold. May I interrupt you? Please. I'm not asking a pleading question. I'm asking a question of what is pleaded of the, let us say, the legal, well, maybe you can't draw the distinction. I'm saying not did they plead something that was plausible on its face. I'm asking the question, did they plead something which, in fact, may not be accepted as legally effective? Maybe those are the same questions. Your Honor, I'll try to answer. I hope I understand it. So do I. I believe that if we just focus on the pleadings in this complaint itself, it simply does not pass the plausibility standard. Let's review the pleadings that were actually made, and I think that one reviews the pleadings in this case, leaving aside the Caster Depot complaint, leaving aside that other issue. I think the Court will see that there's no plausible interpretation that the FRA said, okay, we're going to limit our lien to $2.3 million, and debtor, M.A., you can have money, and just make sure you disperse it this way and that way. That just is not plausible, and here's why. First of all, as a panel contest stated, the FRA debt in the $30 million vicinity exceeded the sale proceeds from the asset itself. So right from the start, we know that the FRA is underwater because the sale proceeds were less than its lien. Secondly, it's important to recognize that in the Second Amendment, no matter what else it says, there is an express clause, and this is on the Independence, page 0106, there is an express clause that says, except to the extent that waivers are set forth herein, there are no other changes in the security documents. There are no other changes in the mortgage, no other changes in our security agreements. Every change that there is, is reflected in this document. And this is important because the only release that the FRA agreed to, the only release that they stated, was to release the lines, the tangible assets sourced from your sale. There is nothing in the Second Amendment that contemplates that they would release proceeds except for the purpose of the disbursement constituted by the Second Amendment. So there is nothing in the Second Amendment that says, oh by the way debtor, you get some kind of dominion and control over everything over and above the $2.3 million we're getting. Quite to the contrary, the Second Amendment is clear. There is no waiver or limitation of security except as expressly stated. Clearly the FRA had to release the tangible railroad lines in order to effectuate the sale. And then the FRA took it upon itself to control the disbursement of the proceeds. The money went to an escrow agent. And the escrow agent was instructed to hold the money until substitute collateral was provided to the FRA. And then the escrow agent was instructed to disburse the money in accordance with an agreement that the FRA had entered into. And that disbursement was $2.3 million to FRA, $13 million to the prior investors and note holders, $2.7 million to Wheeling, and $1 million to M&A. Now that last disbursement that I mentioned, the $1 million to M&A, that completely undercuts any notion that there are any unencumbered funds or that M&A had any interest in any funds other than the $1 million it got. So under the Second Amendment, which says, look, we're not making any waivers unless we expressly set them forth in writing, the one waiver they made was that M&A, the debtor of the estate, wants to get $1 million of proceeds. M&A says, well, never mind that $1 million, we want the rest. That's unencumbered, that's ours too. A completely implausible claim, given the fact that the document itself said what M&A was supposed to get out of proceeds. So what we have here is a commercial loan transaction, which is not all that atypical and not all that unusual. The security lender says, and this is the only plausible interpretation as the bankruptcy court and the district court found, the security lender says, okay, you can sell this asset, and we'll take so much in proceeds, you must disperse other proceeds, which are subject to our lien, but we'll permit them to be dispersed to other recipients, if we get substitute and replacement collateral. And that's what happened. They got replacement collateral, and disbursement was made as permitted. Why isn't your argument just as consistent with the proceeds being subject to contract claims as opposed to the proceeds being subject to liens? Because I think that the courts had relied on the proposition that if a mortgage property is sold, that the mortgagee has a continuing lien in identifiable sale proceeds. Isn't the answer to that that none of the contract claims, contract rights under the amendment, would come into effect, would be enforceable, until FRA had obtained some alternative security satisfactory to it, and on the assumption that it would not have this new security, simply as a duplicate for the old security, it would follow that once the new security occurred, the old security was free, except insofar as it was subject to these contract rights. I think there's an unstated premise in the question that I'd like to identify before I answer it, and it goes back to what Judge Thompson alluded to. There's nothing in the record, nothing to suggest that the replacement collateral was equivalent to the balance of the debt owed to the FRA. But is that a subject that can even be litigated? I mean, the FRA, in effect, was the judge of its adequacy. If FRA says this is adequate, the point of the security is simply to protect FRA. Why isn't the FRA's determination that it is adequate, in effect, an irrefutable one? And on that assumption, the rule would come into, or the analysis would come into effect, that it wouldn't be having double security. Well, Your Honor, let's take that premise as so, that the FRA accepts the substitute collateral as adequate in one sense or another. But still, the documents, the agreement, the Second Amendment makes it very clear where the FRA is saying we'll give up one aspect of our collateral, the proceeds, when we get replacement collateral. So here's a lender saying if we get the replacement collateral, we'll release proceeds, and here's how we're going to release them. Now, there was a condition of their accepting that replacement collateral. A condition of their deeming it to be adequate was that the release of their proceeds had to go to some use or benefit of the debtor, pay down debt. Wheeling was another secure creditor. So FRA says we control these proceeds, these are our proceeds. Now, we'll accept this other collateral, we'll find it adequate, on the condition that our collateral and proceeds is distributed to other parties. Yeah, but now you have got an unstated assumption, because you say our collateral and proceeds will be distributed in the following way. And the question is, at the point of distribution, is it our collateral and proceeds anymore? Proceeds, yes, but collateral? You'd have to, to say it is still collateral or subject to the lien as collateral, you'd have to say that, in effect, there was a double amount of the collateral, and that seems to me implausible. Well, we don't know if it's double or not. I mean, we don't have information regarding the value of the replacement collateral. But in the absence of any evidence to the contrary, if FRA says, yes, this is an adequate substitute, isn't the most plausible inference from that that it was collateral, which was, in effect, just as valuable to it as the prior collateral? You are not sure that inference can be made. However, I go back and again rely upon the fact that in this commercial transaction, the FRA says, we'll give out one bucket of collateral in exchange for getting another bucket of collateral. Simply stated as that. And what both of the law courts held was that this was a single integrated transaction. Based on the simultaneity agreement? Yes, and further, that the FRA had a continuing lien in those proceeds until they relinquished it. And they relinquished it on condition that it go to various parties, such as Wheeling. And that, I believe, establishes that they were encumbered until the moment the check was put in the mail and handed to the recipient. Unless it is simply not plausible to assume that there was simultaneity. In fact, there wasn't simultaneity. There was a period of time between the acquisition of substitute collateral and the distributions under the contract. In fact, they weren't simultaneous. Well, Your Honor, I don't know what the lapse of time was. However, there was no point in time, not a single moment, when MMA had any claim or right to any more than $1 million by the agreement of the FRA. It had no claim to keep anything more than $1 million would be another way of phrasing it. Yes, no claim to keep it, no claim to use it, no dominion over it, no control over it. But if it's only no claim to keep it, that is consistent with, in effect, its legal possession free of the prior lien. I don't think so, Your Honor, because in order for it to qualify as an asset under the Uniform Fraudulent Transfer Act, the whole purpose of the act is to say, if a debtor has a choice in spending money, if the debtor has dominion and control over funds, and it chooses to use those funds to pay a creditor under circumstances that make it voidable under OFTA, then there's liability. However, there are two requirements for a property to qualify as an asset. One requirement is that it has to be property of the debtor. They have to have dominion and control. They have to have the ability to spend it one way or the other. And secondly, it has to be free of a lien. This is a point we made in our brief to this Court. At no time, at no time, did MMA have both dominion and control over the money that went to Wheeling, nor did they have any right to claim that it was unencumbered. So what you're saying, and you may be right, I'm not suggesting you're wrong, but what you're saying is that the contract right, which did immediately take effect once FRA says we've got adequate alternative security, the contract right is sufficient to defeat the claim that the debtor, in effect, had dominion and control for bankruptcy purposes. It doesn't have to be a lien that encumbers it. It can be a contract right that encumbers it. That's precisely correct, Your Honor. And again, that argument is reflected in our brief. There are really two conditions for property that is transferred to constitute an asset capable of being transferred under the Uniform Fraud and Transfer Act. Condition number one is it has to be property of the debtor, which means that under conventional state law, the debtor has to have dominion and control, the ability to spend it the way it wants. And secondly, it can't be encumbered. Now, I think the lower courts were entirely right in saying that, well, this money was always encumbered until it got to the hands of the designated recipients. But if one wants to slow the movie down and look at it on a frame-by-frame basis and look at a different movie, then I would say, well, okay, then it's also true that at no point in time, at no point in time did MMA have any dominion, control, power, right, or authority over the money that Wheeling got. So for that reason as well, it can't be property subject or amenable to a transfer under the Uniform Fraud and Transfer Act. I understand your position, but I thank you for answering my questions. Thank you, Your Honor. Counsel, will you address the last point that the contract obligation is legally equivalent to the prior lien for purposes of this issue? Sure. In fact, it clearly is not, under the UFTA, equivalent to a lien. In fact, we have cited cases in the brief, and I think every case, frankly, decided on this point, disagrees with Mr. Marcus's last proposition. These assets were always property of the debtor MMA. These were still proceeds of the debtor's assets. And when the FRA, and I agree with Mr. Marcus, he said it three times, the FRA released its liens upon perfection of the replacement collateral. That's actually what the Second Amendment in the Warehouse Clause specifically provides. It wasn't a condition to release of their liens that the money be distributed in a particular way. The Warehouse Clause and the document specifically say the only condition to their release is the perfection of the replacement collateral. On this point about dominion and control, the Eighth Circuit's decision in Interior Wood, which we cited, the SEL Maduro case out of Florida, and the Worthco decision out of the Seventh Circuit, all provide the same thing. And that is when you're dealing with the proceeds of the sale of the debtor's assets, it's always the debtor's assets. And whether or not a third party can direct the payment of the purchase price to someone else, whether that be the purchaser or a secured creditor or another third party, is irrelevant to the issue of whether those transfers are avoidable under the UFTA. So on this issue of his saying there's a requirement of dominion and control by the debtor, and the debtor has to be able to pay it to whoever it wants in order for it to be property of the debtor, that's just flatly wrong. And the UFTA doesn't require dominion and control. It requires that the assets be the debtor's assets. They clearly are here. And it requires that at the time of transfer, at the moment of transfer, that the property be unencumbered. It clearly was here. The waterfall was just the waterfall. It was a contractual arrangement between the debtors as to how the unencumbered proceeds would be distributed. If they weren't unencumbered, then the whole agreement makes no sense. They'd have a double lien. The parties would have taken their assets subject to the liens. A surprise to all of them, I'm sure. The idea here was that there would be unencumbered assets that would be distributed by agreement,  Thank you, Your Honor. Thank you.